J-A09012-21

2021 PA Super 101

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.S., FATHER | : | No. 1127 WDA 2020 |

Appeal from the Decree Entered September 23, 2020
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-0000166-2019

BEFORE: STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

OPINION BY STABILE, J.: **FILED: MAY 17, 2021**

D.S. ("Father") appeals from the decree entered September 23, 2020, which terminated his parental rights to his daughter, S.S. ("Child"), born in December 2009, involuntarily. After review, we vacate and remand.

This is a somewhat unconventional termination of parental rights case. Father is Child's adoptive father and biological grandfather. Child's biological mother, A.S., is Father's biological daughter. Father adopted Child in April 2017, following the termination of A.S.'s parental rights. The record reveals that A.S. had substance abuse issues and a related criminal history. Father is divorced and adopted Child as a single parent.

Child's time residing with Father after her adoption was relatively brief. The Allegheny County Office of Children, Youth and Families ("CYF") received a referral regarding the family in May 2017, after Father disciplined Child by

_____

[*] Retired Senior Judge assigned to the Superior Court.

striking her on the legs and buttocks with a flyswatter, inflicting abrasions. Father was arrested in June 2017 and ultimately pleaded guilty to endangering the welfare of children and harassment, receiving a sentence of five years of probation. Father arranged for Child to stay with two family friends who had provided childcare in the past, M.B. and M.B. ("Foster Parents"). Meanwhile, CYF obtained an emergency custody authorization and formally placed Child with Foster Parents on June 7, 2017. The juvenile court entered a shelter care order on June 9, 2017, and adjudicated Child dependent on June 30, 2017. CYF also conducted a child abuse investigation, resulting in a founded report of abuse against Father.[1]

Father was released on bond on the same day as his arrest in June 2017. Initially, a condition of Father's bond prohibited him from having contact with Child, but the condition was lifted in October 2017. Father's reunification goals were to cooperate with CYF, complete a parenting program to learn alternative methods of discipline, and attend supervised visits with Child. Father complied and completed a parenting program by October 2017. CYF referred Father for visits and family counseling through Three Rivers Adoptions Council ("TRAC"), and Father attended visits at TRAC consistently.

For reasons that are not entirely explained, the trial court ended services at TRAC in May 2018. It appears that the court concluded TRAC was exhibiting

---

[1] After the incident involving the flyswatter, but before Child entered foster care, Father shaved Child's head. Child claimed that Father did this to punish her for not brushing her hair, while Father insisted that Child wanted to donate her hair in honor of her young cousin who died of leukemia.

- 2 -

bias in favor of Father. After the court ended services at TRAC, CYF made referrals to several other potential service providers. However, none of those providers were able to facilitate visits between Father and Child successfully. Father made himself available for visits, but Child refused to attend. Father's last visit with Child occurred in June 2018, although he did speak with her on the phone two times after that.

CYF filed a petition to terminate Father's parental rights involuntarily on September 3, 2019, and the trial court conducted a hearing on the petition on August 21, 2020.[2] The critical point of contention during the hearing was why Child began refusing to attend her visits with Father and what relevance that should have on the court's termination analysis. CYF argued that Child began refusing to attend visits because of the trauma she suffered in Father's care, which Father refused to acknowledge. According to CYF, this rendered Father incapable of parenting Child and demonstrated that he still had not remedied the conditions leading to Child's placement in foster care.

In support of this position, CYF presented the testimony of Child's former therapist, Megan Cook, MA, ATR-BC, LPC, among others. CYF did not qualify Ms. Cook as an expert witness. However, Ms. Cook opined that Child exhibited "sematic symptoms that are consistent with what we would see in . . . a child who experienced trauma." N.T., 8/21/20, at 97. Ms. Cook reported that Child verbalized fear of Father and his disciplinary methods. *Id.* at 99. Although

---

[2] The trial court appointed legal counsel to represent Child during the hearing.

Ms. Cook did not provide therapy to Child until September 2018, after Child had already begun refusing to attend visits with Father, she also reported that Child's symptoms became exacerbated "before or right after a visit with either [F]ather or with biological mom or with any phone calls." *Id.* at 96, 99. Ms. Cook added that Child's symptoms became exacerbated at the mere mention of "visits or court or experiences[.]" *Id.* at 99-100. She agreed that Foster Parents were supportive of Child attending visits with Father and opined that Child's fearful behaviors appeared genuine, as they had remained consistent throughout a year and a half of treatment. *Id.* at 101-03.

Conversely, Father contended that Child refused to attend visits because Foster Parents alienated Child from him. Father testified on his own behalf and presented testimony from Neil Rosenblum, Ph.D. Dr. Rosenblum testified that he conducted a series of evaluations of Child, Father, and Foster Parents between 2017 and 2020. *Id.* at 170. He reported that Child appeared fearful of Father at the start of their first and only evaluation together in 2017, but that her mood improved after about ten minutes, and that she then interacted with Father comfortably. *Id.* at 175-76. Child was also able to acknowledge the positive aspects of her relationship with Father. *Id.* at 177-78. By 2020, however, Child's positive attitude toward Father was gone, and she insisted that she hated him and did not want to see him again. *Id.* at 177. While Dr. Rosenblum acknowledged that Child was justified in being fearful of Father, he emphasized that Child's fear did not improve but became "entrenched and . . . broadened in nature over time." *Id.* at 178.

Dr. Rosenblum blamed Foster parents for this situation. He opined that, while Foster Parents may profess to encourage Child's visits with Father, he observed body language indicating that they support Child's refusal to attend. *Id.* at 175, 187. In a report discussing his 2017 evaluations, Dr. Rosenblum recounted that Child arrived for her evaluation with Father "crying profusely" and sitting on her foster mother's lap, while the foster mother held on to Child "tightly, much as a parent might hold an infant in distress." Exhibit 15 at 8-10. After the evaluation with Father ended, Child returned to the waiting room with a "smile on her face and look[ing] pleased," to which her foster mother responded by "look[ing] rather unhappy and possibly disappointed to a certain degree that the session went so well." *Id.* at 9. Dr. Rosenblum also reported that Foster Parents made statements during later evaluations suggesting their disinterest in encouraging Child's visits. While summarizing a 2018 interview with Foster Parents, for example, Dr. Rosenblum recounted that they did not believe it was their responsibility to force Child to visit with Father, that Child had "made up her mind" that she did not want to visit, and that they wanted to adopt Child. Exhibit 16 at 7. Dr. Rosenblum recommended strongly against terminating Father's rights, explaining, "to me it's unarguable that [Child] has been alienated, it's as clear as black and white, it's as plain as day[,]" and that research indicates alienation may lead to psychological damage later in life. N.T., 8/21/20, at 189, 202, 216, 225-27.

Following the hearing, on September 23, 2020, the trial court entered a decree terminating Father's parental rights involuntarily. Father timely filed

a notice of appeal, along with a concise statement of errors complained of on appeal, on October 22, 2020. The court issued its opinion on December 22, 2020, explaining that it rejected Dr. Rosenblum's testimony based in part on a report by psychiatrist Donnesha Slider, M.D. The court indicated that it had admitted Dr. Slider's report during Child's dependency proceeding, although it did not admit her report at the termination hearing, and she did not testify at the termination hearing.

Father now raises the following claims for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.[A.] §[]2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] §[]2511(b)?

Father's Brief at 5 (trial court answers omitted).

We focus our analysis on Father's first claim, as it is dispositive of this appeal. Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

- 6 -

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

To affirm a termination decree, we must agree with the trial court as to any one subsection of Section 2511(a) in addition to Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, the court terminated Father's rights pursuant to Sections 2511(a)(2), (5), (8), and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child

- 7 -

to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

***

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

***

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

Father contends on appeal that he remedied the conditions leading to Child's removal from his care, and that he did all that he reasonably could to achieve reunification. Father's Brief at 27-28, 31-32. Father argues that Child did not remain in foster care due to anything he did or failed to do, but because Foster Parents thwarted his reunification efforts by alienating Child from him. *Id.* at 28, 32. He directs our attention to the testimony of Dr. Rosenblum and maintains that the trial court should not have rejected that testimony. *Id.* at 33-35. Significantly, Father observes that the court explained its rejection of Dr. Rosenblum's testimony by relying on the opinions of Dr. Slider, who did not testify at the termination hearing and whose report it did not admit into evidence at the termination hearing. *Id.* at 34-35. Father acknowledges that Dr. Slider's report was admitted during Child's dependency proceeding, but he insists that the court should not have relied on that evidence to terminate his parental rights unless it was also admitted during the termination proceeding. *Id.* Father asserts that he had no notice the court intended to consider Dr. Slider's report when rendering its termination decision, which prevented him from calling Dr. Slider as a witness or challenging her opinions. *Id.*

Initially, our review of the record confirms that Dr. Slider did not testify at the termination hearing, that the trial court did not admit her report into the record at any point during the termination proceeding, and that the parties and the court did not agree to "incorporate" the dependency record into the termination proceeding, as sometimes occurs in these cases. Dr. Slider's

report does not appear anywhere in the certified record on appeal. Our review of the record also supports Father's assertion that he did not have notice the court might consider Dr. Slider's report when rendering its decision. Dr. Slider was not listed as a potential witness on any of the pre-trial statements, and her name was never mentioned during the termination hearing. Nonetheless, the court indicates in its opinion that it relied on Dr. Slider's report to terminate Father's parental rights. The court reasoned as follows, in relevant part:

> Father has consistently averred that the refusal of [] Child to visit stems from a psychological opinion that "parental alienation" existed in this case and is not related to the trauma from his conduct. Psychological evaluations were performed by Dr. Neil Rosenblum, a stipulated expert in the area of psychology. The Court routinely utilizes the services of Dr. Rosenblum and relies on his expert opinions.
>
> However, in this case the Court, respectfully, had concerns with Dr. Rosenblum's recommendations and opinion of "parental alienation" that he proffered. To this end, the Court ordered that another psychological expert review the case. Dr. Donnesha Slider, a child and adolescent psychiatrist, [] authored a report which was made part of the record during the March 13, 2019 permanency review hearing. The Court incorporated Dr. Slider's recommendations for reducing stress associated with the triggering events pertaining to visitation with Father[ into its permanency review order.[3]] This Court finds that the behavior

---

[3] The trial court's March 13, 2019 permanency review order states as follows regarding Dr. Slider's report and recommendations:

> At the Court's request, Dr. Donnesha Slider, M.D., Child and Adolescent Psychiatrist, reviewed the case. Her report was made part the record, via agreed admission by the parties. Dr. Slider made four (4) recommendations as part of her case review, which included medication management of anxiety to reduce the intense

exhibited by [] Child refusing to attend visitation was more consistent with a traumatized child.

Additionally, the Court accepted the testimony of Megan Cook, licensed professional counselor and board certified art therapist [from the] Center for Victims, who provided corroborating testimony. Ms. Cook testified that she began working with [] Child in September of 2018, and she conducted weekly individual therapy sessions to treat trauma. During the therapy, [] Child verbalized fear of Father and the forms of discipline he used on her. Ms. Cook credibly testified that the behavior exhibited and the reactions of [] Child appeared to be typical of a child who experienced trauma. The therapist concluded that [] Child's fearful behaviors, despite encouragement of support, were genuine and specifically not[ed] that they were consistent throughout the one and a half years of treatment. To the extent that a conflict exists between Dr. Slider and Dr. Rosenblum, the Court sitting in its role as fact finder, placed the appropriate weight upon the reports and the evidence as well as considered it in the overall context of this particular case as well as the corroboration by trauma therapist Megan Cook. Accordingly, the Court rejected the theory of "parental alienation" opined by Dr. Rosenblum. . . .

* * * *

This Court previously acknowledged that Dr. Rosenblum routinely testifies in the Allegheny County Family Division as an expert; however, the Court respectfully disagrees with his expert opinion in this particular case. Dr. Rosenblum authored an opinion that recommended against terminating parental rights. Although this Court routinely finds merit in his opinions, with respect to this case, the totality of the testimony and evidence presented at the termination proceeding as well as credibility determinations, gave reason for this Court to weigh his opinion as less persuasive for a number of reasons. Dr. Rosenblum has viewed the issues between [] Child and [] Father as parental alienation, which this Court does not find persuasive. The overwhelming number of

_____

stress response for triggering events or environments. The use of medication management was rejected by Father.

Exhibit 18 (Permanency Review Order dated March 13, 2019, at 2).

- 11 -

witnesses and corroborating testimony, including the opinions of Dr. Slider and Megan Cook, convinced this Court that [] Child's refusal to visit with [] Father was due to trauma, and not alienation.

Trial Court Opinion, 12/22/20, at 18-19, 24-25 (unnumbered pages, footnote and citations to the record omitted).

The trial court's *sua sponte* consideration of evidence outside the record is fatal to its termination decree. **See M.P. v. M.P.**, 54 A.3d 950, 955 (Pa. Super. 2012) (quoting **Ney v. Ney**, 917 A.2d 863, 866 (Pa. Super. 2007)) ("A trial court may not consider evidence outside of the record in making its determination. Nor may this court uphold a trial court's order on the basis of off-the-record facts.") (citations and quotation marks omitted). The court's explanation that it admitted Dr. Slider's report into the record during Child's dependency proceeding does not remedy this error. Termination proceedings often occur simultaneously with dependency proceedings, but these two types of proceedings remain distinct, with their own docket numbers, records, and divisions within the Court of Common Pleas. Father did not appeal from any orders entered in Child's dependency proceeding, and this Court does not have access to the dependency record. Assuming Dr. Slider's report is present in the dependency record, we have no way of reviewing it and confirming that it supports the court's findings. Moreover, as Father argues, the court's actions denied him the opportunity to question Dr. Slider or otherwise challenge her report during the termination hearing.

We cannot conclude that the trial court's error was harmless. "[F]inding harmlessness in a termination [of parental rights] case requires us to conclude

that the evidentiary error could not have had any impact upon the [trial] court's decision." ***In re A.J.R.-H.***, 188 A.3d 1157, 1175 (Pa. 2018). The evidence supporting involuntary termination of Father's parental rights in this case was relatively tenuous, given that he complied with his reunification goals by completing a parenting program and attending visitation to the extent Child was willing to participate, and given that Dr. Rosenblum opposed termination. CYF's case depended to a large degree on discrediting Dr. Rosenblum, and the fact that the court relied on Dr. Slider's report to justify its findings contrary to Dr. Rosenblum's opinion makes it clear that the report impacted the court's decision.

Accordingly, we must vacate the decree terminating Father's parental rights to Child involuntarily and remand for a new hearing to be held as soon as possible. ***See id.*** at 1179 (vacating the decrees and remanding for a new hearing due to the trial court's improper admission of hearsay evidence). After the hearing, the trial court must enter a new decision granting or denying termination. The court must base its decision on evidence admitted during the termination proceedings.

Decree vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  5/17/2021