J-S34032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: E.L.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.E.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 700 WDA 2022 |

Appeal from the Decree Entered May 11, 2022
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
O.A. No. 36 of 2021

BEFORE: DUBOW, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:　　　　　　　　**FILED: OCTOBER 17, 2022**

T.E.L. (Mother) appeals from the decree entered in the Court of Common Pleas of Butler County Orphans' Court (orphans' court) granting the petition of J.P.G. (Father) to involuntarily terminate her parental rights to E.L.G. (Child) (D.O.B. 08/16) pursuant to 23 Pa.C.S. § 2511. Mother argues that the orphans' court erred in granting the petition because Father created barriers precluding her from seeing Child and forming a bond with him. We affirm.

We take the following factual background and procedural history from the orphans' court's opinion and our independent review of the certified record.

---

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

**A.**

Mother and Father were never married. At the time of Child's birth in August 2016, Mother was incarcerated and released approximately three months later. When Child was between five and six months old, Mother again was arrested and has not seen Child since then.

Approximately four years later, on January 27, 2021, Mother filed a *pro se* complaint seeking shared legal and physical custody of Child. She alleged that Father uses illegal drugs and that she wants to reconnect with Child, but Father will not allow it. (***See*** *Pro se* Complaint for Custody, at §§ 6, 9, 10). At the April 28, 2021 conciliation conference, Mother appeared *pro se* and requested a continuance. The conciliator granted the request and continued the conference to June 24, 2021. However, both Mother and Father were ordered to undergo hair follicle tests and to participate in the Lifesteps Families Forever seminar before the rescheduled conference. Mother also was ordered to provide proof of successful completion of inpatient rehabilitation, compliance with her outpatient treatment, copies of any drug screens from the past six months and proof of completion of the Lighthouse SOAR (Students Occupationally and Academically Ready) program prior to the next conference. (***See*** Conciliator's Report, 5/03/21, at 1-2).

On June 24, 2021, Mother failed to appear at the continued conference, and the conciliator recommended dismissing the complaint for failure to

proceed, which the orphans' court did on June 28, 2021. (**See** Conciliator's Report, 6/28/21, at 1); (Orphans' Court Order, 6/28/21).

On August 12, 2021, Father filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511. At the hearing on the petition, Mother, Father and Mother's probation officer, Jordan Dananay, testified. Both parents were represented by counsel.

**B.**

Father testified that Child was approximately eight years old at the time of the hearing. He explained that at the time of Child's birth, Mother was incarcerated and given a five-day furlough to spend time with Child, but instead she was taken back to jail the next day by court order and Child has remained in his care ever since. When Mother was incarcerated, Father took Child to visit many times. Mother was released from jail approximately three months after Child's birth, and she and Father lived with Child at paternal grandmother's home, before moving to interim housing provided by the Lighthouse Foundation. When Child was approximately five months old, Mother was arrested on an outstanding warrant while she was on a walk with Father and Child. Mother has not seen Child since then. (**See** N.T. Hearing, 4/20/22, at 7-9, 15).

According to Father, in early 2021, approximately 18 months prior to the hearing, Mother sent a message to him asking whether she could see Child because she had been living in a three-quarter house and had been drug-free

for a year. However, because Mother had been in custody for most of that time, Father wanted to see "a year of her on the streets clean and doing good," but Mother never followed up with him to propose when and where she could see Child. Father heard that Mother was kicked out of the three-quarter house for drinking alcohol but did not know if that was true. (*See id.* at 9-10).

Father went on to testify that Mother has never sent Child a holiday card or gift or asked to speak to Child or visited with Child in Father's home. Father stated that Mother "absolutely" knew the street address where he lived in Butler, Pennsylvania, as he had been living there for nearly three years. The *pro se* custody complaint she filed in January 2021 contained that address for Father. He stated that she could have contacted him about Child by calling because he had the same phone number for four or five years and they had messaged on Facebook within the last year before the hearing. He stated that he has never blocked Mother's phone number and that his phone number has never been disconnected. Father did not always know how to contact Mother by phone because she changed her phone number several times, so he usually would reach her on Facebook. (*See id.* at 10-12, 14, 22, 26); (*Pro Se* Complaint for Custody, 1/27/21, at 1).

He maintained that he underwent the hair follicle test pursuant to the conciliator's order but did not bring the test results with him to the hearing. Father did not know if Mother completed the test, but he never saw proof that

she completed any of the programs and treatment ordered by the conciliator. (**See** N.T., at 26-27, 32, 34-35).

Father testified that Mother has never performed any parental duties for Child and he would have worked with her about seeing Child if she stayed clean, but he did not want to bring her into Child's life for her to just be taken out of it again due to her drinking and getting arrested. According to Father, Child knows his wife, D.G., as his mother. D.G. has been in Child's life since he was five months old when Mother was arrested and Father and D.G. started dating. Child and D.G. are close and Child turns to her for comfort. Child also has a half-sibling who lives in Father's home. (**See id.** at 12-13, 19-20).

On cross-examination, Mother's counsel attempted to show that Mother did not know Father's location. Counsel focused on the fact that Father had lived at three different addresses during Child's lifetime and was not certain about exact dates and addresses. (**See id.** at 14-19, 23).

The orphans' court found Father's testimony credible. (Orphans' Ct. Op., at 2).

## C.

Mother has not been incarcerated since June 2020 when she went into long-term inpatient and then outpatient drug rehabilitation. She stated that she has been sober since December 2019, with one relapse on the illegal drug, "Molly," in February 2021. Other than the February 2021 relapse, Mother has passed all drug screens necessary for her parole. She has a thirteen-year-old

daughter that she did not see for a time while actively using illegal drugs, but she started seeing her again after she "was able to get better and improve herself." To maintain her sobriety, she keeps herself busy by working, seeing her thirteen-year-old daughter every weekend, riding horses and taking care of her dog. She is in a mental health but not drug and alcohol program. Mother testified that she had been living at her current address for one month and lived at two other residences over the approximate year-and-a-half before that. (*See* N.T., at 39-40, 42, 48-50).

Mother stated that she has tried to reach Father since the beginning of 2021, but that he blocks her phone number to prevent her from contacting him. She said she got Father's current phone number a year before the hearing and was able to contact him, but they were unable to work out an arrangement for her to see Child, although she was willing to have the visits supervised and undergo drug testing due to her addiction history. Mother also maintained that she asked Father for updates about Child, but that he did not provide the information. (*See id.* at 41, 44-45, 47).

Although she testified that Father's wife, D.G., did not block her communication attempts, she stated that she did not believe that she should have to contact D.G. to reach Father about Child. D.G. provided her with some information about Child but did not make any arrangements to enable Mother to see him. (*See id.* at 41, 48). When her counsel asked her on direct

examination about when she began making efforts to contact Father and/or see Child, Mother responded:

> Once I actually had like a set place, which I thought was a set place, with a guy, and I ended up, you know, noticing that was obviously a big mistake. So I waited until like I was on my feet completely. You know, I was working, you know, and then I ended up losing my job, of course, over COVID. You know, I wasn't employed for a while.
>
> So, that's what happened. And, you know, I filed for—I didn't even—I didn't even file for custody. I just wanted to see my son. That's all. And I wanted it through the system because of how he was.

(Orphans' Court Op., 7/11/22, at 4) (citing N.T., at 43).

Mother admitted that she knew Father's address since the beginning of 2021 before she filed the custody complaint. She explained that she did not attend the custody conciliation because she was in West Virginia and in an abusive relationship at the time. She also said it was because she wanted a retained attorney. (*See* N.T., at 44, 48).

When counsel asked Mother on cross-examination if she had any evidence of her attempts to reach Father, his blocking of those attempts or of her completion of programs ordered by the conciliator, she said that she did, but did not bring it to the hearing. Mother said that she did not realize that the custody conference she missed due to allegedly being in West Virginia was on zoom. She stated she does not believe that she has a bond with Child. (*See id.* at 53, 55-57).

**D.**

Mother's counsel presented Mother's probation officer over Father's counsel's objection. Officer Dananay testified he began supervising Mother in 2014/2015. He described Mother's drug related legal struggles and that, since 2021, she has been compliant. The officer did not know if she completed the SOAR program. According to the probation officer, Mother currently has her own apartment and will remain on probation[1] until February 25, 2023. However, he did not have information about Mother's parenting ability. (**See id.** at 59, 61-63).

**E.**

Child's counsel told the court that he observed Child, Father, D.G. and Child's half-sister in the home and he said that Child is happy and well cared for there. He summarized that Child "seems very comfortable in the setting he's at, and he's being parented." (**See id.** at 64).

On May 10, 2022, the orphans' court granted Father's petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1). It found that Mother had not preserved her parental rights explaining:

> This court found Father's testimony at the April 20, 2022 hearing on his petition[] to be more credible than that of Mother. This court also found the evidence adduced at the hearing

---

[1] Although Mother said she was on parole, Officer Dananay said she actually was on probation.

established, in a clear and convincing fashion, that for a period
well in excess of six (6) months immediately preceding Father's
filing of the Petition for Involuntary Termination of Parental Rights,
Mother evidenced a settled purpose of relinquishing her parental
claims to Child and failed to perform her parental duties associated
with Child. 23 Pa.C.S. § 2511(a)(1). …

(Orphans' Ct. Op., at 10) (some capitalization omitted). Mother timely

appealed and filed a contemporaneous statement of errors. *See* Pa.R.A.P.

1925(a)(2)(i).

## II.

## A.

Mother challenges the orphans' court's termination of her parental rights

to Child.[2] She claims that her rights should not have been terminated where

Father put barriers in place to prevent her from seeing him. (**See** Mother's

Brief, at 15-17). Specifically, she could not locate Father and when she finally

_____

[2] Our standard of review of this matter is well-settled:

… [I]n termination of parental rights cases [we are required] to
accept the findings of fact and credibility determinations of the
trial court if they are supported by the record. If the factual
findings are supported, appellate courts review to determine if the
trial court made an error of law or abused its discretion. A decision
may be reversed for an abuse of discretion only upon
demonstration of manifest unreasonableness, partiality,
prejudice, bias, or ill-will. The trial court's decision, however,
should not be reversed merely because the record would support
a different result. We have previously emphasized our deference
to trial courts that often have first-hand observations of the
parties spanning multiple hearings.

*Interest of S.S.*, 252 A.3d 681, 685 (Pa. Super. 2021) (citations omitted).

did, he refused to make plans for her to see Child without her "achieving certain timeframes of sobriety unilaterally established by [him]." (*Id.* at 16).

> … Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Interest of S.S.*, 252 A.3d at 685–86 (citations omitted).

**B.**

"The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in the relevant subsections of Section 2511(a)." **See Interest of A.M.**, 256 A.3d 1263, 1270 (Pa. Super. 2021) (brackets and citation omitted). In this case, the trial court terminated Mother's rights pursuant to Section 2511(a)(1), which provides that termination is proper if:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a

child or fails to perform parental duties for at least the six months prior to the filing of the termination petition." *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008) (citation omitted). Although Section (a)(1) of the statute focuses on the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. *See id.* "[A] court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." *In re E.D.M.*, 708 A.2d 88, 91 (Pa. 1998).

> A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise "reasonable firmness" in resisting obstacles placed in the path of maintaining the parent-child relationship. This means that a parent can no longer claim relief from the responsibility of parenthood due to an inability to perform that function. The child, in the meantime, will grow and will need nurturing, care, attention and stability if it is not to suffer irreversible damage from neglect however occasioned.

*In the Interest of Q.J.R.*, 664 A.2d 164, 165-66 (Pa. Super. 1995), *appeal denied*, 674 A.2d 1074 (Pa. 1996) (citations omitted).

Where it is claimed that the custodial parent places barriers to the continuance of the parental relationship, our Supreme Court, in *In re Adoption of C.M.*, 255 A.3d 343, 357 (Pa. 2021), stated:

> Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation ... including situations in which a custodial parent has

deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child[.] [I]f the failure to perform parental duties is the result of obstructive tactics, such failure is excused[;] to obtain the benefit to that excuse, a parent must exhibit reasonable firmness in attempting to overcome the obstructive behavior.

*In re Adoption of C.M.*, 255 A.3d at 357 (internal citations and quotation marks omitted).

**C**.

The record supports the orphans' court's determination that there is clear and convincing evidence that termination is appropriate. The credible evidence was that Mother's last contact with Father about Child was approximately a year-and-a-half before the April 2022 hearing. (*See* N.T., at 10). Father testified that Mother has never performed any parental duties for Child, and she did not provide any evidence to suggest she has ever provided any financial, emotional or physical support of Child. (*See id.* at 12). Nor did she provide any evidence that she has completed any of the programs recommended by the custody conciliator. (*See id.* at 53, 56).

Although she alleges that she did not know Father's physical address, she admitted she had his current address since before she filed the custody complaint in January 2021, and, in fact, the custody complaint lists his current address. (*See id.* at 44-45); (*Pro se* Complaint, at 1). She did not testify or present any evidence that she went to Father's home to attempt to see Child, despite knowing the address for at least fifteen months before the hearing.

- 12 -

Further, the record reflects that she failed to appear for the custody conciliation conference allegedly due to circumstances related to her physically abusive relationship, and she maintained that she "didn't even file for custody." (**Id.** at 43); (**see id.** at 48). As stated by the orphans' court, although Mother filed a custody complaint: "Mother's failure to appear for the Custody Conciliation Conference, and the concomitant dismissal of the Custody Complaint, further evince Mother's only passive interest in the Child." (Orphans' Ct. Op., at 9).

As to her claim that Father prevented her from maintaining the relationship with Child, she provided no evidence to support her claim that she tried to call Father but that he blocked her phone number. To the contrary, the trial court found as credible Father's testimony that he never blocked her from calling. (**See** N.T., at 11-12, 22). In fact, even assuming *arguendo* that Father blocked her phone number as she claims, she was able to contact him at all times through his wife or his Facebook account. (**See id.** at 11-12, 41). In the eight years of Child's life, Mother has never sent him cards, money or gifts, nor has she suggested times or places to spend time with him. (**See id.** at 10-11).

Based on the foregoing, the orphans' court had clear and convincing evidence that Mother has "evidenced a settled purpose of relinquishing [her] parental claim to [Child]" and "has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). While there was conflicting testimony about

whether Mother's failure to make any effort regarding Child was due to Father frustrating her efforts or because she failed to make any reasonable efforts to form a parent-child relationship, we accept the orphans' court's credibility determinations accepting Father's testimony that he never blocked any of her phone calls. (*See* Orphans' Ct. Op., at 10); *Interest of S.S.*, 252 A.3d at 685.

As we have stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The orphans' court did not err or abuse its discretion when it terminated Mother's parental rights pursuant to Subsection (a)(1).

### D.

Having concluded that the grounds for termination have been met under subsection (a), we must give primary consideration to subsection (b) and "the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).[3]

---

[3] Subsection 2511(b) provides:

> **(b) Other considerations.–**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights

*(Footnote Continued Next Page)*

- 14 -

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. ... While a parent's emotional bond with his or her child is a major aspect of ... [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

*Interest of A.M.*, 256 A.3d at 1272 (citation omitted).

In this case, it is undisputed that Child has been in Father's care since shortly after his birth, and that Mother has not seen Child since he was a few months' old. (*See* N.T., at 8, 9). There is nothing in the record that demonstrated that Father failed to care for Child or meet his needs. Child views Father's wife, whom he has known since he was approximately five months of age, as his mother. When Child needs comfort and care, he turns to her. Father testified that his wife is willing to adopt Child. (*See id.* at 12-13). Mother, who has not seen the Child since shortly after his birth, testified she and Child have no bond. (*See id.* at 55, 57).

Given all that, the record supports the orphans' court's conclusion that Child's developmental, physical and emotional needs are best met by

_____

of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

- 15 -

terminating Mother's parental rights where Father's home is the only home Child knows and he has no bond with Mother. We discern no error or abuse of discretion in the court's determination of subsection (b).

Accordingly, for the aforesaid reasons, we affirm the orphans' court decree terminating Mother's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/17/2022