**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.L.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 605 WDA 2023 |

Appeal from the Order Entered May 1, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000100-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: N.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.L.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 606 WDA 2023 |

Appeal from the Order Entered May 1, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000099-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 607 WDA 2023 |

Appeal from the Order Entered May 1, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-98-2022

J-A25013-23

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: January 31, 2024**

D.L.W. a/k/a D.W. ("Father") appeals from the orders entered on May 1, 2023, which involuntarily terminated his parental rights to his biological sons, J.B., born in December 2015, N.W., born in January 2017, and T.W., born in June 2019.[1, 2]  We affirm.

We glean the relevant factual and procedural history of this matter from the certified record.  The Allegheny County Office of Children, Youth, and Families ("CYF") first began providing in-home services to the family in June 2019, shortly after Mother and T.W. tested positive for opiates at the time of T.W.'s birth.  Father and Mother, who were never married, cohabited for approximately five years and separated roughly at the time of T.W.'s birth in June 2019.  All three children initially resided with Mother but began living with Father in February 2021.

In March 2021, Mother was enrolled in an in-patient drug rehabilitation program for her opioid addiction.  She was contacted by Father, who requested that she leave the program in order to take over caring for the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  As discussed further *infra*, no termination petition was filed with respect to J.M.B., the children's mother ("Mother"), due to her untimely death.

[2]  The record reflects that Father has two additional children with two separate women.  Neither those children nor their mothers was involved in these proceedings.

children. To prevent the children from continuing to be left alone and unsupervised by Father, Mother left her rehabilitation program against medical advice and attempted to care for them while under the influence of narcotics. *See* N.T., 4/28/23, at 64, 94, 255. After receiving reports of these circumstances, CYF obtained an emergency custody authorization and removed all three children from the care of Mother and Father on April 6, 2021.

On April 7, 2021, the court held a shelter care hearing and placed the children in kinship care with their maternal aunt, J.B. ("Maternal Aunt"), with whom they have remained throughout these proceedings. Maternal Aunt is also an adoptive resource for all three children. *See id*. at 142. We note that during the course of these proceedings, Maternal Aunt was appointed as a secondary educational and medical decision maker for the children due to Father's chronic lack of availability and Mother's demise. *See id*. at 85-86.

The children were respectively adjudicated dependent on June 23, 2021, with the court establishing an initial placement goal of reunification. Father was ordered to complete a sexual assault recidivism risk assessment due to his prior conviction for statutory sexual assault in September 2011, which rendered him subject to registration as a sexual offender under Pennsylvania law. *See id*. at 66. Dr. Beth Bliss completed the psychological evaluation component of Father's court-ordered risk assessment in October 2021. *See id*. at 163. Dr. Bliss determined that Father presented a low risk of recidivism

with respect to his history of sexual assault, but her observations led her to diagnose him with major depressive disorder and antisocial personality disorder. *See id*. at 165-66. In November 2021, Dr. Bliss authored a report recommending that Father receive "individual outpatient counseling." *See* CYF Exhibit 6 at 7 (unpaginated).

Meanwhile, Father was offered and directed to participate in weekly supervised visits with the children through the organizations A Second Chance and Auberle. *See* N.T., 4/28/23, at 65-66. Ultimately, Father's visitation schedule was reduced to a bi-monthly schedule due to Father's inconsistent participation. *See id*. at 65-66. Father never progressed to unsupervised visits.

Mother passed away on September 13, 2021, under circumstances that are not entirely clear from the record before us. We gather from the testimony presented at the April 2023 hearing, however, that her death was a result of her addiction. *See id*. at 154, 184. Separately, Father was charged with several criminal offenses, including aggravated assault with a deadly weapon, in connection with allegations that he had discharged a firearm into an occupied house on September 19, 2021.

Also in September 2021, Father was first referred to the Pennsylvania Organization for Women in Early Recovery ("POWER") for a telephonic assessment of his potential need for substance abuse treatment. *Id*. at 5-7. POWER determined that Father required additional assessment and referred

to him to a secondary organization, Pathway to Care and Recovery ("Pathways"). *Id*. at 6. Father failed to follow-up on this referral. *Id*. at 206. Father was referred to POWER a second time in February 2022 and was re-referred to Pathways for a supplemental assessment. *Id*. at 6-7. Father again failed to follow through. *Id*. at 205-06.

In January 2022, Dr. Bliss conducted a follow-up evaluation of Father, along with assessments of his and Maternal Aunt's respective interactions with the children. She authored a supplemental report in February 2022, which confirmed her earlier diagnoses and advanced a number of recommendations related to reunification. Based largely upon Dr. Bliss's findings, the dependency court made a number of additions to Father's permanency goals in an order filed on April 25, 2022, which directed Father to, *inter alia*: (1) engage with mental health and substance abuse treatment; (2) resolve his pending criminal charges; (3) visit with the children on a more consistent basis; (4) obtain independent housing; and (5) submit to drug screens. In permanency review orders filed between September 2022 and March 2023, Father's compliance with these directives was rated as minimal.

On August 8, 2022, CYF filed petitions seeking to involuntarily terminate Father's parental rights to all three children pursuant to 23 Pa.C.S.

§ 2511(a)(2), (5), (8), and (b).[3]   The orphans' court held a termination hearing on April 28, 2023, at which point in time J.B. was seven years old, N.W. was five years old, and T.W. was three years old.  Therein, CYF adduced testimony from, *inter alia*, Dr. Bliss, CYF caseworker Stephanie Schmidt, A Second Chance representative William Pipkins, Auberle representative Verlin Jenkins, and adoption home study caseworker Ciera James.   CYF also introduced into evidence the permanency records concerning the children and various other forms of pertinent documentation.  Father testified on his own behalf.

On May 1, 2023, the orphans' court filed orders involuntarily terminating Father's rights to the children pursuant to § 2511(a)(2), (5), (8), and (b).  On May 24, 2023, Father filed timely notices of appeal to this Court at each of the above-captioned cases along with concise statements of error pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).   Thereafter, the orphans' court filed a responsive opinion pursuant to Rule 1925(a)(2)(ii) collectively addressing Father's arguments in each case.  This Court consolidated these cases *sua sponte* pursuant to Pa.R.A.P. 513.

Father raises the following issues for our consideration:

---

[3]  On October 12, 2022, the orphans' court appointed KidsVoice to serve as legal interest counsel for each child in conformity with 23 Pa.C.S. § 2313(a). Although KidsVoice also served as the guardian *ad litem* ("GAL") for each child, the trial court determined that no conflict existed between their respective best and legal interests that would preclude such dual representation.

1.      Did the orphans' court abuse is discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2.      Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the [children] pursuant to 23 Pa.C.S. § 2511(b)?

Father's brief at 7.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record.  Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.  Termination of parental rights has significant and permanent consequences for both the parent and child.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and

- 7 -

convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830 (cleaned up); *see also* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to § 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "To affirm a termination decree, we must agree with the trial court as to any one subsection of [§] 2511(a) in addition to [§] 2511(b)." *Int. of S.S.*, 252 A.3d 681, 686 (Pa.Super. 2021) (cleaned up).

Consistent with this case law, our analysis in the instant case will focus upon § 2511(a)(2) and (b), which provide as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and

> causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

In order to satisfy § 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021) (cleaned up). Grounds for termination pursuant to § 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010)). On this point, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*. (cleaned up).

If a petitioner establishes adequate grounds for termination pursuant to § 2511(a), we then turn to § 2511(b), which requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Of note, we "should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (cleaned up). Moreover, this determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1105-06 (cleaned up). Thus, there is no "exhaustive list" of factors that must be considered. *Id*. at 1113 n.28. While the particular facts of each case determine the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." *T.S.M.*, *supra* at 267 (cleaned up).

Our Supreme Court has mandated, however, that an evaluation pursuant to § 2511(b) should consider the child's bond with his or her parent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Specifically, we must render "a determination of whether the bond is necessary and beneficial to the child[.]" *K.T.*, *supra* at 1113. This evaluation involves consideration of the effect of severing the child's bond with their parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional

- 10 -

consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *E.M.*, *supra* at 484). Our Supreme Court has distinguished, however, "extreme emotional consequences" from a mere "adverse or detrimental impact" in the termination context. *Id*. at 1111. Specifically, the High Court has cautioned that Pennsylvania courts "must not truncate [their] analysis and preclude severance based solely on evidence of an adverse or detrimental impact to the child." *Id*. at 1114 (cleaned up).

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent." *Id*. at 1111 (emphasis in original; cleaned up). Thus, we consider factors that arise from the facts of each case, such as the child's need for permanency and length of time in foster care, whether the child is bonded with the foster parents, and whether the foster home meets the child's needs. *Id*. at 1113. Overall, "bond, plus permanency, stability and all intangible factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of primary importance in the [§] 2511(b) analysis." *Id*. at 1109 (cleaned up).

With these overarching legal principles in mind, we turn to Father's first claim for relief challenging the orphans' court's findings pursuant to § 2511(a)(2). *See* Father's brief at 14-17. Although Father purports to challenge the orphans' court's findings pursuant to § 2511(a)(2), we note that

his argument is largely constrained in addressing only the elements of proof pertaining to § 2511(a)(5) and (8), *i.e.*, discussing solely whether Father had remedied the "conditions" that caused the removal of the children, without discussing whether he suffers from unremedied incapacities that precluded him from providing essential care to the children, as is paramount under § 2511(a)(2). **See id**. Nonetheless, we discern that Father is arguing that the trial court's findings pertaining to § 2511(a) were not supported by clear and convincing evidence.

The orphans' court opined that "CYF has demonstrated by clear and convincing evidence that Father is unable to parent" the children and that this parental incapacity "will not be remedied within a reasonable period of time based on Father's lack of effort and non-compliance with the established goals." Orphans' Court Opinion, 7/5/23, at 10. We find ample support in the certified record for these findings.

There seems to be little dispute that Father suffers from significant personal incapacities that directly impact his ability to provide essential parental care to the children. As noted above, Dr. Bliss diagnosed Father with depression and a personality disorder. The certified record similarly indicates that he has not sought appropriate treatment for those conditions.[4]

_____

[4] Father testified that he was briefly in therapy at some point in 2021 and stopped at the beginning of 2022. **See** N.T., 4/28/23, at 219. Since then, he has not enrolled in any new therapeutic treatment. **Id**. at 130, 219.

- 12 -

Specifically, Dr. Bliss testified that Father's untreated mental conditions negatively impacted his ability to be a stable parent to the children, as follows:

> [T]he mental health symptoms and maladaptive personality traits are impacting his stability and impacting his parenting. That's where you have the instability, the history of irresponsibility, the breaking rules and laws, difficulty trusting others, unstable relationships with others.
>
> So all of that falls into his mental health and maladaptive personality traits, and all of that needs to be fixed in order to help him to be a better or more stable parent for the kids.

N.T., 4/28/23, at 195. She also explained:

> There are multiple risks with that diagnosis being untreated, one with instability, children need stability. So essentially [the children,] who have gone through so much and have some pretty significant needs, that stability is crucial for them and so that instability is concerning.
>
> . . . .
>
> And then the history and continued pattern of breaking rules and laws, there's two issues. One would be if there were concerns of violence or safety risk for the children but, you know, potentially more so just the risk of having a parent that was the primary caregiver being incarcerated or going to jail and then the instability that would come with that at that point.

*Id*. at 175-76.

The children individually have a number of specialized medical and educational needs. Specifically, Ms. James testified that N.W. and J.B. have each been diagnosed with attention deficit hyperactivity disorder ("ADHD"), depression, and post-traumatic stress disorder ("PTSD"), for which they receive medication. *See id*. at 159. While T.W., who was three years old at the time of the hearing, had not been formally diagnosed, the record reflected

- 13 -

that he had been displaying issues with cursing and acting out with physical violence. *See id*. at 31, 40, 190-91. All three children are also enrolled in individualized trauma therapy. *See id*. at 159-61. Both N.W. and J.B. have engaged in self-harming behavior. *See id*. at 88. Finally, we note that J.B. has an individualized educational plan. *See id*. at 85.

The certified record indicates that Father's lack of mental wellness and personal stability have caused N.W., J.B., and T.W. to be without essential parental care that is necessary for their physical and mental well-being. *See* 23 Pa.C.S. § 2511(a)(2). Specifically, Ms. Schmidt testified that Maternal Aunt was ultimately designated as a secondary medical and educational decisionmaker for the children due to Father being chronically unavailable to render critical consent on the children's behalf at medical appointments and educational meetings. *See* N.T., 4/28/23, at 84-85 (explaining "it was very difficult to get ahold of [Father] for him to consent even though he was made aware of every single appointment").

Father's unavailability and lack of stability is also evident in his lack of participation in supervised visitations with the children. Mr. Pipkins, who helped to supervise Father's visits through A Second Chance, reported that Father was offered a total of thirty-five supervised visits with the children between July 2021 and January 2023. *See id*. at 9-10. Ultimately, Father participated in twelve of the visits offered, and he unilaterally canceled or

failed to confirm at least fifteen of the scheduled appointments. *See id*. at 10-22.

Beginning in February 2023, Ms. Jenkins began supervising Father's visits with the children through Auberle. *See id*. at 28. He was offered a total of five supervised visitations and he participated in two such appointments. *See id*. In other words, Father participated in less than half of his scheduled appointments to visit with the children. He also never progressed beyond supervised visitations.

Similarly, Father's lack of stability and availability is reflected in his drug screening records. Ms. Schmidt testified that Father began random screenings in April 2022, and was called to submit to random urine screens on fifty-three occasions. *Id*. at 73-75. Of those requests, Father ultimately appeared for only three such tests.[5] *Id*. Similarly, Father has flatly failed to complete a substance abuse treatment assessment. *See id*. at 206.

We also find the testimony of Dr. Bliss to be clearly indicative of Father's inability to ameliorate these incapacities. She reported that Father was unable

---

[5] Father appeared for testing on December 12, 2022, December 21, 2022, and February 1, 2023. *See* CYF Exhibit 1. While all three screens revealed a positive result for having used marijuana, it appears that, at the time, Father was in possession of a medical marijuana card. *See id*.; N.T., 4/28/23, at 131. Our analysis here is focused solely upon this evidence to the extent that it is demonstrative of Father's incapacity and his inability to take the steps necessary to address that incapacity.

to take any responsibility for his former parental shortcomings or make meaningful progress towards improving:

> My concern with him is that he does take no accountability and that he wouldn't change things about himself that would need to be changed because he doesn't see them as they need to be changed. He doesn't see that anything was his fault or a problem on his end.
>
> And so because of that, that doesn't really make any meaningful changes, and that's kind of seen through the time periods between my different evaluations . . . . that he wasn't really taking any steps to change anything because again he didn't think he needed to change anything.

*Id*. at 170. In sum, she opined that "he's not in a position now and I don't believe that he would be in a position in the near future to meet their needs." *Id*. at 180. Furthermore, she emphasized that Father needed to engage in therapy to address these instability concerns. *See id*. at 169 ("[T]he other concerns I had in terms of maladaptive personality functioning, decision-making skills, instability in his life, . . . those things cannot be addressed by medication, and it really is something that requires therapy.").

Based upon the foregoing review of testimony, we observe no abuse of discretion or error of law in the orphans' court's conclusion that involuntary termination of Father's parental rights was warranted pursuant to § 2511(a)(2). Overall, our review of the evidence of record finds sufficient supports for the orphans' court's findings that Father's lack of mental stability and availability constituted an incapacity that caused the children to be

without essential parental care or control, and Father would not remedy this incapacity. *See* 23 Pa.C.S. § 2511(a)(2).

Accordingly, we now turn to Father's arguments pursuant to § 2511(b), wherein he asserts that his purported bond with the children should essentially preclude the termination of his parental rights. *See* Father's brief at 19 ("The children have the right to permanency, but also have the right to have their relationship with Father preserved."). Respectfully, we find that Father's arguments misrepresent the evidence adduced at the hearing.

The orphans' court "evaluated the primary bond of each child, individually, and determined that the primary bond resides between [Maternal Aunt] and each [c]hild, respectively." Orphans' Court Opinion, 7/5/23, at 29. Considering the bond and the evidence adduced at the termination hearing, the court found that "termination will serve the developmental, physical, and emotional needs and welfare of [the c]hildren." *Id*. We agree.

With respect to the bond analysis mandated by our Supreme Court, the testimony of Dr. Bliss is highly instructive, as she had the opportunity to conduct direct, interactional observations of Father and the children. She testified that T.W. has an intense but "insecure attachment" to Father, which caused him significant anxiety whenever Father's attention was not solely focused upon T.W. *See* N.T., 4/28/23, at 172-73. In contrast, Dr. Bliss opined that N.W. and J.B. each manifested an "ambivalent attachment" to Father. *Id*. at 176-77.

While Dr. Bliss recognized that the children each share some form of a bond with Father, she concomitantly testified that Maternal Aunt serves as the "psychological parent" for all three children, *i.e.*, "the person that they view as being able to meet their needs, who they would turn to if they needed comforting or reassurance, who they see as . . . their primary attachment and the person that they would turn to if they need someone." *Id*. at 178-79. Thus, she testified that termination of Father's parental rights would not constitute a significant detriment to any of the children. *See id*. at 180. She also averred that each child's connection with Maternal Aunt would "mitigate or ameliorate any negative effects of severing" their relationship with Father. *Id*.; *see also id*. at 90 (Ms. Schmidt explaining that the children see Maternal Aunt "as a mother figure").

Dr. Bliss's observations dovetail with Ms. Jenkins' testimony concerning her observations. Ms. Jenkins reported that although Father tried his "best" to supervise the children during supervised visitations, he was largely unsuccessful at responding to their outbursts and behavior. *Id*. at 33 ("[I]t was just one kid set off the other, and they just all three at one point would just run around."). By contrast, Ms. Jenkins also observed the children in their kinship placement and testified that Maternal Aunt was comparatively capable of managing the children's energy and behavior. *Id*. at 33 ("When I had first visited the [foster] home, I actually thought they were different kids . . . . I have not witnessed any disruptive behavior. They seem to respond and care

for [Maternal Aunt] when she ask[s] them to do something as opposed to my observation with [Father].").  Furthermore, the testimony detailed above speaks definitively that Maternal Aunt is better suited to address the children's specialized medical and educational needs.  ***See id***. at 84-85.

Based upon the foregoing, we discern no abuse of discretion or error of law in the trial court's conclusion that involuntary termination of Father's parental rights would best serve the children's developmental, physical and emotional needs and welfare.  ***See*** 23 Pa.C.S. § 2511(b).  Thus, we affirm the orders terminating Father's parental rights to the Children.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

1/31/2024