J-S01031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: I.G.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.R.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1517 MDA 2024 |

Appeal from the Decree Entered September 11, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2024-0089a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.B.B, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.R.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1518 MDA 2024 |

Appeal from the Decree Entered September 10, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2024-0088a

BEFORE: NICHOLS, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: MARCH 11, 2025**

Appellant, A.R.A. ("Mother"), appeals from the September 10, 2024,

and September 11, 2024, decrees involuntarily terminating her parental rights

_____

[*] Former Justice specially assigned to the Superior Court.

to her natural children K.B.B. (born in February 2020), and I.G.B. (born in March 2021) (collectively, "the Children"), respectively.[1]  We affirm.

We gather the following relevant facts and procedural history of this case from the certified record.  The Adams County Office of Children and Youth Services, where the family then resided, obtained emergency protective custody of the Children in December 2022, due to Parents' substance use and the fatality of the Children's infant sibling.  Factual Findings, 5/16/24, at ¶ 5;[2] N.T., 9/9/24, at 59.  Mother ultimately pleaded guilty to misdemeanor charges of endangering the welfare of children and was sentenced to an extended period of probation.  Similarly, Father was convicted on felony charges of endangering the welfare of children and was serving a sentence of five to ten years' incarceration at the time of the subject hearing.  *See* Agency Exhibits 2 & 3; *see also* N.T., 9/9/24, at 5, 62-63.

Following removal, the Children were placed in foster care, where they remained throughout the ensuing dependency proceedings.  Factual Findings,

---

[1] By separate decrees of the same date, the orphans' court additionally terminated the parental rights of the Children's father, B.B.B. ("Father," collectively with Mother, "Parents").  Father did not file an appeal or participate in the instant appeals.

[2] The court accepted and incorporated into the record the Agency's proposed findings of fact, which the Agency filed at the request of the court's pretrial procedure on May 16, 2024.  *See* N.T., 9/9/24, at 7-9.  Thus, to the extent the court adopted the proposed findings of fact, we cite to them herein.

5/16/24, at ¶¶ 5, 6. The court then adjudicated the Children dependent on January 3, 2023. Factual Findings, 5/16/24, at ¶ 8; N.T., 9/9/24, at 60.

In May 2023, jurisdiction of the Children's dependency matters was transferred from Adams County Juvenile Court to York County Juvenile Court, as best we can discern, after Parents moved there. Factual Findings, 5/16/24, at ¶¶ 10-11. Thereafter, on July 6, 2023, the juvenile court found the existence of aggravated circumstances pursuant to 42 Pa.C.S.A. § 6351(e)(2); however, the court did not relieve York County Office of Children, Youth & Families ("CYF" or "the Agency") from the obligation to make reasonable efforts toward the permanency goal of reunification. Factual Findings, 5/16/24, at ¶ 13; N.T., 9/9/24, at 60.

To that end, the Agency established the following goals for Mother: cooperate and comply with the Agency and service providers; participate in substance use treatment and mental health treatment; maintain housing and income stability. N.T., 9/9/24, at 61. Agency caseworker, Destiney Michael, testified concerning the services provided to Mother in furtherance of her goals:

> When the family was active with Adams County, they were provided with drug testing services; nurturing parenting education with Justice Works; they both had psychological evaluations at Hempfield Behavioral Health. . . . And then in York County we've continued to provide ongoing drug testing through [A]ver[H]ealth and Justice Works. Catholic Charities in-home team was assigned when the family was active in York. We continue[d] the nurturing parenting education with PA Child, and then we'[v]e also been providing the supervised visitation through PA Child.

*Id.* at 65.

Throughout the dependency proceedings the court conducted regular review hearings at which it consistently deemed Mother's compliance and progress as minimal until January 2024, when the court deemed both compliance and progress in satisfying her goals as moderate. *See* Factual Findings, 5/16/24; *see also* N.T., 9/9/24, at 61. By that time, Mother obtained employment and housing. *See* N.T., 9/9/24, at 70. Additionally, she was for the most part cooperating and complying with services aimed at reunification, including supervised visitation, parenting education, drug and alcohol testing, and in-home services. *See id.* at 65-66, 70-75. However, due to her insufficient "level of progress," Mother's visitation remained fully supervised. *Id.* at 29; *see also id.* at 64-65, 75.

On May 16, 2024, the Agency filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511 (a)(1), (2), (5), (8), and (b). The orphans' court held an evidentiary hearing on September 9, 2024. At the time, the Children, then four and three years old, respectively, were represented by a separate guardian *ad litem* ("GAL") and legal interest counsel.[3] Mother was present and represented by counsel.

---

[3] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans'' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). In this case, the orphans' court appointed
*(Footnote Continued Next Page)*

By agreement, the orphans' court incorporated the dependency records.[4] *See* N.T., 9/9/24, at 6-7; *see also* Order, 9/9/24 ("The court shall take judicial notice of and incorporate all petitions, motions, orders, exhibits, stipulations, testimony, and findings. . . .") (cleaned up). Further, the Agency presented the testimony of Karen Brabham, Mother's recovery specialist through the RASE Project; Moira Lecount and Suzanne Kearse with Catholic Charities; Susan Scott, program director with PA Child Support Services, who supervised visitation; R.J., foster father; and Ms. Michael. Mother testified on her own behalf. The court additionally heard from the Children's court appointed special advocate ("CASA"), Randye Barnhart.

_____

separate legal interest counsel for the Children. As such, the court complied with the requirements of 23 Pa.C.S.A. § 2313(a).

[4] To the extent that the court took judicial notice of the records of the underlying dependency proceedings, while we do not address the propriety of doing so, we note that dependency proceedings and termination proceedings are two separate, distinct proceedings "with their own docket numbers, records, and divisions within the Court of Common Pleas." *Interest of S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021).

Moreover, we observe with displeasure that these records were not included with the certified record. Although this does not hamper our meaningful review, we pointedly remind counsel that appellants bear "the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Commonwealth v. Wint*, 730 A.2d 965, 967 (Pa. Super. 1999) (citations and internal quotation marks omitted); *see also* Pa.R.A.P. 1921 Note ("Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

By decrees dated September 9, 2024, and entered on September 10, 2024, and September 11, 2024, respectively, the court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.[5] The orphans' court filed a Rule 1925(a) opinion on November 8, 2024.[6]

On appeal, Mother raises the following issues for our review:

I. Whether the [orphans'] court erred in involuntarily terminating the parental rights of [M]other pursuant to Section 2511(a)(1), 2511(a)(2), 2511(a)(5) and 2511(a)(8) of the Adoption Act?

II. Whether the [orphans'] court erred in concluding that an involuntary termination of parental rights of [M]other would best serve the needs and welfare of the Children pursuant to Section 2511(b) of the Adoption Act?

---

[5] Pursuant to the order of September 20, 2024, the court granted the Agency's ensuing request for change in the Children's permanency goals and changed the goals from reunification to adoption with the concurrent goal of permanent legal custodian. Subsequent appeals incorrectly referencing September 9, 2024, dependency orders, docketed at Nos. 1491 & 1492 MDA 2024, were ultimately quashed by this Court.

[6] The Honorable Steven D. Stambaugh presided over the subject proceeding and placed his findings and conclusions of law on the record in open court. **See** N.T., 9/9/24, at 96-103. Thereafter, the record indicates that he was removed from the bench, and these matters were reassigned to the Honorable Kelley L. Margetas. Judge Margetas filed a Rule 1925(a) opinion, which erroneously analyzes only the goal change orders.

*See* Mother's Brief at 6 (cleaned up).[7]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

---

[7] Both the Children's GAL and legal interest counsel argued in favor of termination of Mother's parental rights at the conclusion of the subject hearing. *See* N.T., 9/9/24, at 90-92. They filed a joint brief with the Agency in support of termination of Mother's parental rights.

***Interest of M.E.***, 283 A.3d 820, 829-830 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. ***Id.*** at 830; ***see also*** 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013); ***see also*** 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm termination. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Accordingly, we analyze the decrees involuntarily terminating Mother's parental rights to Children pursuant to Section 2511(a)(2)[8] and (b) which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

[8] Given our disposition relative to Section 2511(a)(2), we need not review Sections 2511(a)(1), (5), and (8) and make no conclusions as to the validity of the orphans' court's findings with respect to those subsections. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

. . .

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Subsection (a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong

continuous parental ties. . . . This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted) (emphasis omitted). Section 2511(a)(2) grounds are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by Interest of K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023). We have long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

On appeal, Mother asserts that the orphans' court abused its discretion in terminating her parental rights because she "made substantial progress towards all of her goals and . . . reunification was imminent." Mother's Brief at 57-58. Specifically, Mother highlights that she has obtained and maintained housing and employment. She further underscores her cooperation, contact, and engagement with the Agency and her service providers, as well as the Children. *See id.* at 48-59.

In terminating Mother's parental rights pursuant Section 2511(a), the court found:

> The court notes that we are now 21 months in from an adjudication. Although the court has heard testimony regarding Mother's progress, the court does acknowledge that even Karen Brabham spoke of Mother's progress, "In the last three months." The [termination of parental rights petition] in this case was filed on May 1[6]^th. The court went through each of the last three

- 10 -

months from today's date going back to June 9th. The court, therefore, notes that the bulk of Mother's progress has occurred in the wake of the [termination of parental rights petition].

The court is most deeply troubled by Mother's ongoing dysregulation/deregulation, call it what you will, but Mother's inability to handle routine hiccups in life's daily activities. The court had heard a number of witnesses speak of Mother's deregulation with the spilling of coffee into some sort of a bag during a visit by the maternal grandmother. Be it that simple thing, it knocked Mother's visitation completely off the rails. In the grand scheme of life's various tumults, spilling coffee in a bag has to rank as one of the least destabilizing experiences that a parent could anticipate.

The court notes that PA Child still is required to have a cancellation policy in effect as to Mother, still requires that all visits are fully supervised. And cannot provide a date certain when Mother might possibly progress to partially supervised visitation. . . . Mother continues to have difficulty planning for weather during visits, which has been an ongoing and chronic problem. The court heard from a number of witnesses that Mother remains emotionally deregulated, which causes issues in safety, in judgment, and shows a lack of independence by Mother.

The court does acknowledge that Mother has made some recent progress, but the fact of the matter is that Mother remained more committed to Father, in this court's opinion having weighed the evidence, than to the Children; because it wasn't until Father was removed from the home, and/or that event was looming following trial, that the alternate plan of the maternal grandmother coming up to York and helping Mother came to the fore. The court can only speculate as to what might have occurred had Mother made the decision to put her alliance with her children, rather than Father, and sought the aid and assistance and participation of the maternal grandmother well over a year ago.

Mother's counsel did correctly cite to the court's July 6th of 2023 aggravated circumstances order, and I did order to try and get Mother to reunify. . . . That was well over a year ago, and Mother was still playing games with drug testing. She was still cautiously playing games hiding the alcohol in February 23 of 2024, refusing tests, buying time, allowing the metabolic absorption of the alcohol in her system during a visit . . . . And

ultimately, when faced with the third refusal, she actually consented, and she was still positive for the alcohol. Unfortunately, Mother's progress has been far too little and far too late.

Mother was on notice about the [dialectical behavioral therapy ("DBT")] early on in this case and only recently . . . commenced it. . . . .

Further, although Mother has engaged the maternal grandmother as a support, what's clear to this court is the same thing that is clear to PA Child is that Mother cannot even demonstrate independence with her visits as of yet and does rely upon the maternal grandmother in those visits only further making unavoidably and inescapably clear to the court that there is no light on the horizon for when Mother might progress from fully supervised visitation to partially supervised visitation.

N.T., 9/9/24, at 98-102 (cleaned up). As the record supports the orphans'

court's findings, we discern no abuse of discretion.

As stated *supra*, throughout the Children's dependencies, the court

found Mother displayed minimal compliance and progress until January 2024,

when it then determined that she achieved moderate compliance and

progress. **See** Factual Findings, 5/16/24. At the time of the subject hearing,

Ms. Michael testified to Mother's overall compliance and cooperation and

characterized Mother's progress as moderate. **See** N.T., 9/9/24, at 61, 65-

66, 70-73. She noted that the "bulk of progress" achieved by Mother had

- 12 -

occurred "since May [2024], which would have been at the time of the [filing of the termination petitions] and after Father's incarceration."[9] *Id.* at 61.

Ms. Michael confirmed that Mother had obtained stable housing and income; completed parenting education; engaged in supervised visitation; and cooperated with in-home services. *See id.* at 70, 72, 75. Although Mother participated in drug and alcohol testing, including a hair follicle test, she most recently tested positive for alcohol on February 23, 2024, after refusing two prior tests that day. *See id.* at 71-72, 74-75. Further, Mother was recommended to participate in DBT[10] following a psychological evaluation. While Mother reported recent engagement in such therapy on an outpatient basis, Ms. Michael testified that the Agency had not received confirmation from the provider.[11] *See id.* at 65, 70-71; *see also id.* at 25-26, 84.

Significantly, Ms. Michael emphasized the difference between compliance and progress. *See id.* at 66. Despite a "reasonable amount of time to achieve reunification," she confirmed ongoing concerns with Mother's "ability to safely care" for the Children. *Id.* at 66, 68; *see also id.* at 75. Ms.

_____

[9] We note that the prohibition against consideration of actions after the filing of a termination petition is not applicable to Section 2511(a)(2). *See* 23 Pa.C.S.A. § 2511(b).

[10] The specific nature of this therapy or what it entails is not described in the record.

[11] Ms. Michael did however concede that Mother participated in therapeutic services, including DBT, with Suzanne Kearse from Catholic Charities. *See* N.T., 9/9/24, at 71; *see also id.* at 24-25.

Scott, who supervised visitation on behalf of PA Child, acknowledged recent progress with Mother's executive functioning and planning skills. ***See id.*** at 29-30. However, she testified, "I think the bigger concerns still relate to just the emotional dysregulation that we see at times that can impact the safety or judgement, and then overall just greater independence. . . ." ***Id.*** at 30.

Specifically, Ms. Scott testified as follows:

Q. And in looking at the dysregulation, what are you seeing or what are your concerns:

A. We still continue to see times where [M]om gets overly emotional about something and how that can impact a visit or the kids. For example, a couple instances . . ., grandma spilled her coffee, and I think it got in Mom's bag and Mom's bag got wet. Mom was really upset about that and became emotional and crying in the visit. There was a time where [I.B.] lost her play card at the arcade, and that resulted in [Mother] getting overly emotional and crying. There were a couple times when Mom would come early to a visit, which is great, but it was an hour or so early. Staff was busy and not expecting Mom. Mom would be banging on the door in the lobby to get in. Staff spoke with Mom . . . . and then that happened again, and staff had to revisit it.

Q. And this dysregulation you mentioned, can it affect her ability to judge situations or provide safety for the [C]hildren? Can you explain what you mean by that?

A. So overall when it's more of a minor dysregulation, some of those impacts could be just the kids getting upset and they might cry or just, you know, seem a little bit bothered by it. Sometimes they carry on and don't seem phased by it. Other times it seems like if Mom is fixated on something that is causing her some sort of emotional distress that is leading to the dysregulation, it's almost like that fixation of that can then kind of distract Mom.

So there was an example where . . . they were at the pool, and [K.B.] had needed a diaper change. He had pooped. It was sort of this stress of "What do I do? Should I take him to the shower?" And then Mom proceeded to take [K.B.] out of the pool

- 14 -

but left behind [I.B.]. [I.B.] didn't have floaties on. An bystander picked up [I.B.] out of concern that she was too little to be in that deep of water without floaties. So there was a big safety concern there. Staff, you know, went and immediately addressed that to Mom and spoke about it.

And there was another instance of even just something as [I.B.] needed some new socks when they were at the trampoline park or what have you. She just went to take [I.B.] to get new socks and left [K.B.] in the ball pit. So just sometimes being preoccupied with something and it results in a judgement call.

*Id.* at 30-32 (some brackets in original).

Moreover, as a great deal of Mother's visitation occurred with either Father or the maternal grandmother additionally present and providing support, Ms. Scott further expressed concerns related to Mother's lack of independence and/or codependence. She stated, "[A] lot of the visits have been with support with either -- before it was, you, know [Father] being visits for support. Recently, it's been grandma being in a large majority of the visits. Without that, we do see, you know greater concern, and when it is just [Mother] on her own, that independence piece." *Id.* at 32-33. This was echoed by Ms. Michael, who also suggested that, given the timing, Father impeded Mother's progress: "In addition to that, the progress that has been made after Father's incarceration has raised some concerns for potential codependency and inability to make protective decisions on Mother's behalf. It appears that there were potentially some progress that could have been made that may have been stagnated during Father's involvement." *Id.* at 62.

Based upon the foregoing, we discern no abuse of discretion by the orphans' court in concluding that termination of Mother's parental rights pursuant to Section 2511(a)(2) was warranted. The record substantiates the orphans' court's conclusion that Mother's repeated and continued incapacity in the form of her persistent emotional dysregulation and lack of independence has caused the Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See A.H.*, 247 A.3d at 443. Moreover, the evidence above evinces that Mother cannot or will not remedy same. *See id*.

Significantly, at the conclusion of the subject proceedings, the Agency had afforded Mother a variety of services for almost two years. Ms. Michael testified that no services that could have been offered were not offered to Mother. *See* N.T., 9/9/24, at 66. Even though Mother had recently begun to make progress, she had failed to achieve reunification. Therefore, to the extent the court found Mother's delayed progress untimely, the court was within its discretion to terminate Mother's parental rights under Section 2511(a)(2). We reiterate and emphasize that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See id*. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of

progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006).[12]

Having found sufficient grounds for termination pursuant to Section 2511(a), we must next determine whether termination was proper under Section 2511(b). Section 2511(b) requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child" when considering whether to involuntarily terminate parental rights. 23 Pa.C.S.A. § 2511(b); **see also T.S.M.**, 71 A.3d at 267.

We note that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." **K.T.**, 296 A.3d at 1105-1106. Overall, this inquiry is neither formulaic, nor mechanical. **See id**.

This inquiry must include consideration of the bond between the parent and the child. **See In re E.M.**, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has explained, however, that "only a necessary and beneficial" parental bond should be maintained. **K.T.**, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause extreme emotional

---

[12] To the extent Mother additionally assails the termination of her parental rights on the basis of Judge Stambaugh's subsequent suspension from the bench, this argument is without merit as there is no evidence that such prior actions had any impact on his disposition of the instant matter. **See** Appellant's Brief at 60-61.

consequences or significant, irreparable harm. *Id.* at 1109-1110. The extent, however, of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (cleaned up). It is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up). Courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *K.T.*, 296 A.3d at 1106. Finally, we also note that a child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." *Id*.

Instantly, Mother assails the orphans' court's finding that termination of her parental rights served the Children's developmental, physical and emotional needs and welfare pursuant to Section 2511(b). *See* Mother's Brief at 61-63. She contends that she shares an undisputed bond with the Children and that negative consequences would result to the Children if such bonds were severed. *See id.* at 62-63 ("Severing the bond between Mother and the Children would most definitely destroy the beneficial relationship that the Children have with Mother. . . .").

In determining that termination additionally served the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), the orphans' court emphasized the Children's bond with their foster parents and their need for permanency. The court stated:

> The court will now turn to the bond under Section 2511(b).  The court has noted that the Agency has met its burden of proof by clear and convincing evidence under bond.  The court has seen the Children with the foster parents at multiple proceedings.  The Children are deeply bonded with the foster parents.  They refer to one of the foster parents as Dada and the other foster parent as Papa. . . .  Although the Children are bonded with Mother, I do not find that that bond even remotely approaches the bond that the Children have with the foster parents.  The foster parents provide all of the daily physical, mental, emotional, psychological, and any and all other needs for both children.  I also find that the Children are likewise bonded with the foster parents' other adoptive children.  They are and have been a family unit.  Ultimately, the Children's needs for permanency reign supreme.

N.T., 9/9/24, at 102 (cleaned up).  This is supported by the certified record.

Ms. Scott recognized that the Children share a bond with Mother.  *Id.* at 40.  She testified to Mother's continued participation in supervised visitation with the Children that had advanced to two three-hour visits per week, one in the community and one at the provider office.  *See id.* at 28-29.  Ms. Scott observed the Children to be excited for and to enjoy visits, as well as to show affection.  *See id.* at 29-30, 35, 40.  However, Ms. Scott reported that the Children sometimes "struggle to separate" from their foster parents or seek reassurance or affection from them during visits.  *Id.* at 35; *see also id.* at 42.  She further indicated that the Children then transition back to their foster parents at the end of a visit without issue.  *Id.* at 35-36 ("When they see the resource parents at the end of the visit, they often, you know, will exclaim, 'There is daddy.  Look.'  And they go and transition without problems."); *see also id.* at 42-43.  Notably, the Children's foster father, R.J., affirmed that

- 19 -

the Children do not "ask to talk to . . . or see [Mother] in between" visits. *Id.* at 53.

Despite the expansion of Mother's visitation, such visitation remained fully supervised. *Id.* at 29, 64-65. As Ms. Scott explained, "We've gradually worked to increase the duration and expand out into the community. We just haven't gotten to a point of further progress[ion] from there." *Id.* at 29. Significantly, Ms. Scott was unable to pinpoint "a date certain by which [she] would feel comfortable progressing Mother to partially supervised visitation[.]" *Id.* at 42.

As noted *supra*, Ms. Scott expressed outstanding concerns related to Mother's ongoing emotional dysregulation and lack of independence which affect Mother's judgment and compromise the Children's safety. *See id.* at 30-32. Thus, the record demonstrates that the Children's bond with Mother is not necessary and beneficial. *See K.T.*, 296 A.3d at 1109-1110.

In contrast, Ms. Scott testified that the Children's foster parents, whom they refer to as "[D]addy and [P]apa," provide them daily physical, emotional, and mental health support. *Id.* at 39, 41-42. R.J. confirmed that the Children are doing "very well" in their home, which is pre-adoptive. *Id.* at 48, 51. He testified that the Children get along "great" with the three older children in the home. *Id.* at 51. He further reported that they have dealt with K.B.'s special needs. Specifically, the foster parents have taken K.B. to specialists related to digestive/gastrointestinal issues. *See id.* at 48. Additionally, K.B.

- 20 -

had tubes placed in his ears, which resulted "a lot more clarity in his voice," and receives speech therapy. *Id.* at 49.

As such, Ms. Michael testified that it was in the Children's best interests to terminate Mother's parental rights. She explained, "The Children have been in care for an extended period of time. They are in a stable home that is willing and able to provide permanency for them. The Agency's position is that it's in the Children's best interest to have permanency." *Id.* at 68 (cleaned up). Based upon the foregoing, we discern no abuse of discretion by the orphans' court's conclusion that Mother's parental rights will serve the Children's developmental, physical, and emotional needs pursuant to Section 2511(b).

Accordingly, we affirm the decrees pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/11/2025