J-S31011-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.A.H.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C.L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1319 EDA 2025 |

Appeal from the Decree Entered May 15, 2025
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000103-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: I.H.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C.L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1320 EDA 2025 |

Appeal from the Decree Entered May 15, 2025
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000104-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: M.H.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C.L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1321 EDA 2025 |

Appeal from the Decree Entered May 15, 2025
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000105-2025

J-S31011-25

IN THE INTEREST OF: I.C., A MINOR  :  IN THE SUPERIOR COURT OF
                                    :        PENNSYLVANIA
                                    :
APPEAL OF: M.C.L.L., MOTHER         :
                                    :
                                    :
                                    :
                                    :
                                    :
                                    :  No. 1322 EDA 2025

Appeal from the Decree Entered May 15, 2025
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-AP-0000110-2025

BEFORE:  PANELLA, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.E.:                **FILED JANUARY 16, 2026**

M.C.L.L. ("Mother") appeals from the May 15, 2025 decrees involuntarily terminating her parental rights to I.C., a male, born in January 2021, and to triplets born in September 2023, M.A.H.C., a male, and I.H.C. and M.H.C., females ("the triplets") (collectively with I.C., "the Children").[1, 2]  After careful review, we affirm.

_____

[1] I.C.'s biological father passed away in November of 2024.  **See** N.T., 5/14/25, at 37.

[2] The parental rights of the triplets' biological father, A.H., were also involuntarily terminated by separate decree on the same date.  In addition, the trial court terminated the parental rights of any unknown putative fathers to the Children by separate decrees.  Neither A.H. nor any unknown putative fathers have appealed or participated in this appeal.

- 2 -

Factual and Procedural History

We gather the following relevant factual and procedural history from the certified record. The Philadelphia Department of Human Services ("DHS") was involved with this family prior to the Children's births, when Mother's older three children were removed from her care after she was residing in a domestic violence shelter with them, but intended to return home to their natural father, who had physically abused the family.[3] **See** DHS Exhibit 6 at 2. While Mother's three children were in placement, she gave birth to I.C. in the State of New Jersey.[4] Upon his discharge from the hospital, I.C. was placed in the emergency protective custody of a New Jersey child welfare agency due to the ongoing dependency of Mother's older children. As best we can discern, the New Jersey trial court transferred I.C.'s dependency matter to the Philadelphia Court of Common Pleas in February of 2021, and he was promptly placed in the custody of DHS.

The trial court adjudicated I.C. dependent on April 13, 2021 and established his permanency goal as reunification. In furtherance of that goal, Mother was ordered to, *inter alia*: (1) complete a parenting capacity evaluation; (2) undergo a mental health evaluation and follow all resulting

---

[3] Mother's older three children have a different biological father from the Children.

[4] There is no evidence that Mother was a resident of New Jersey at the time of I.C.'s birth.

recommendations; (3) attend parenting classes; and (4) participate in supervised visitation. Mother completed a parenting capacity evaluation ("PCE") with licensed psychologist, William Russell, Ph.D. Although there is no evidence that Mother participated in the ordered mental health evaluation, she was attending mental health treatment. *See* N.T., 5/14/25, at 42-44. According to DHS caseworker, Dayonna McCray, Mother stopped her mental health treatment sometime in 2023, and, as best we can discern, against medical advice. *See id.* Mother presented documentation that she completed a parenting class in 2021. *See* Mother's Exhibit 1 at 1. With respect to supervised visitation, Mother progressed to one unsupervised visit every other week in October of 2023, but the court revoked those visits in October of 2024, and ordered that her visits again be only supervised. *See* DHS Exhibit 3 (I.C.) at 81-82, 87.

At the time Mother gave birth to the triplets, I.C.'s dependency was ongoing, as Mother was not in compliance with I.C.'s permanency plan. The triplets were placed in the emergency protective custody of DHS upon their respective discharges from the hospital. They had separate shelter care hearings in November of 2023, which resulted in the court confirming DHS's custody and their separate foster placements. DHS filed dependency petitions with respect to the triplets on November 30, 2023. Thereafter, Mother relocated to the State of New York in approximately March of 2024. *See* DHS Exhibit 6 at 6. The court did not adjudicate the triplets dependent until

September 12, 2024.[5] On the same date, the court issued separate orders finding that aggravated circumstances existed as to Mother due to the involuntary termination of her parental rights to her older children, discussed above.[6] The court further ordered that DHS was not to provide efforts to reunify Mother and the triplets. In contradiction to that directive, the court established the triplets' respective permanency goals as reunification and directed Mother to complete substantially similar permanency goals as those ordered in I.C.'s case. As such, Mother participated in another PCE with Dr. Russell, who diagnosed her at that time with impaired intellectual functioning, *inter alia*. **See** N.T., 5/14/25, at 23-24. With respect to supervised visitation, it is important to note that the court ordered weekly supervised visits, but Mother attended only three, with her final visit occurring on May 1, 2025. **See id.** at 40, 49; **see also** DHS Exhibit 3 (I.H.C.).

On March 11 and 12, 2025, DHS filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23

_____

[5] The dependency hearing was first scheduled for November 27, 2023, but cancelled because the dependency petitions had not been filed. **See** DHS Exhibit 3 (I.H.C.) at 24. The hearing was next scheduled for January 18, 2024, but was continued upon the request of DHS. **See id.** at 24-25. Mother requested and was granted a continuance for the next scheduled hearing date of March 11, 2024. **See id.** at 25. DHS requested and was granted continuances for the hearings scheduled on April 22, 2024, May 22, 2024, and July 18, 2024. **See id.** at 26-27.

[6] Mother's parental rights to those children were involuntarily terminated in December of 2021.

Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[7] At that time, I.C. had been in placement for 48 months, and the triplets for sixteen months.

The involuntary termination proceeding with respect to the Children occurred on May 14, 2025.[8] The Children were represented by their guardian *ad litem* ("the GAL"), Catherine Houseman, Esquire, of the Support Center for Child Advocates ("SCCA").[9]

DHS presented the testimony of Dr. Russell, as well as DHS caseworkers Ms. McCray and Aliyah Richardson. DHS also introduced a total of six exhibits,

_____

[7] DHS filed amended petitions as to the triplets on March 14, 2025, to correct a clerical error.

[8] The Honorable Daine Grey, Jr., presided over the subject involuntary termination proceeding and the Children's underlying dependency matters.

[9] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in conformity with" 23 Pa.C.S.A. § 2313(a). *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). Further, if the GAL is appointed to the dual role of representing a child's best and legal interests, "appellate courts should review *sua sponte* whether the orphans' court made a determination" that the child's legal interests and best interests "did not conflict." *Id.* In this case, inasmuch as I.C. was four years old, and the triplets were 20 months old, the court did not appoint separate legal counsel for them. We discern no error. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied.); *see also id.* at 1089 n.17 (stating that children "as young as five or six years of age . . . hav[e] opinions which are entitled to weight in legal proceedings concerning their custody."); *In re M.M.R.*, 287 A.3d 894 (Pa. Super. 2022) (unpublished memorandum at 5 n.3) (stating that a GAL can represent both the legal and best interests of a four-year-old child in accordance with *T.S.*).

- 6 -

including, but not limited to, copies of the trial court dockets from the Children's dependency cases, which the court admitted into evidence. **_See_** DHS Exhibit 3; **_see also_** N.T., 5/14/25, at 14. Mother testified on her own behalf and introduced one exhibit, which the court also admitted into evidence.

By separate decrees dated May 14, 2025, and entered on May 15, 2025, the trial court involuntarily terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On May 29, 2025, Mother timely filed separate notices of appeal along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated Mother's appeals _sua sponte_ on June 9, 2025. The trial court filed its Rule 1925(a) opinion on June 30, 2025.

<u>Issues</u>

Mother presents the following issues for our review:

1. Whether the trial court erred in permitting into evidence the documents pertaining to all the prior dependency court orders – those not having been certified?

2. Whether the trial court erred in allowing into evidence DHS Exhibit 5 (PCE of Mother – 4/25/23) and Exhibit 6 (PCE of Mother – 6/20/24) and more specifically in regards to the opinions having been expressed therein?

3. Whether the trial court erred in not permitting questioning of DHS's expert Dr. Russell regarding the doctor's opinion concerning Mother's parenting capacity as (to paraphrase) being generally accepted in the field (Frye)?

4. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(1), the evidence was insufficient to establish a settled purpose of relinquishing parental claim, or having refused or failed to perform parental duties?

5. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2), the evidence having been insufficient to establish Mother caused the Children to be without essential parental care, nor could that not have been remedied?

6. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(5), the evidence having been insufficient to establish conditions having led to placement continued to exist, nor could not have been remedied?

7. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(8), the evidence having been insufficient to establish having led to placement continued to exist?

8. Whether the trial court erred in terminating Mother's parental rights under 23 Pa.C.S.A. § 2511(b), the evidence having been insufficient to establish termination of parental rights would best serve the needs and welfare of the Children?

9. Whether the trial court's decision under the above Sections 2511(a)(1), (2), (5), and (8) inclusively, as well as under Section 2511(b), is submitted as having been contrary to the weight of the evidence?

Mother's Brief at 6-7 (cleaned up, footnotes omitted).[10]

_____

[10] The GAL filed a brief in this Court which advocated for the affirmance of the involuntary termination decrees.

Evidentiary Claims

In her first three issues, Mother contends that the court abused its discretion with respect to three separate evidentiary rulings, which we review according to the following standard.

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Wilson v. Smyers*, 284 A.3d 509, 514 (Pa. Super. 2022) (internal citations and quotation marks omitted).

a. The Children's dependency dockets

In her first issue, Mother argues that the trial court abused its discretion when it admitted into evidence the dockets from the Children's underlying dependency cases, which contained the text of the court's orders. *See* Mother's Brief at 16. Specifically, Mother asserts that the dockets were not properly certified pursuant to Pa.R.E. 902(4), or otherwise authenticated. *See id.* at 16.

"Unless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). "Generally, authentication requires a low burden of proof." *Commonwealth v. Jackson*, 283 A.3d 814, 818 (Pa. Super. 2022).

However, "authentication is required prior to admission of evidence." *Commonwealth v. Mangel*, 181 A.3d 1154, 1159 (Pa. Super. 2018). Evidence can be authenticated through the testimony of a witness with knowledge that "an item is what it is claimed to be." Pa.R.E. 901(b)(1). In the alternative, evidence can be authenticated by "[a]ny method of authentication or identification allowed by statute or a rule prescribed by the Supreme Court." Pa.R.E. 901(b)(10).

Pa.R.E. 902 states, in relevant part:

The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted:

. . .

**(4) Certified Copies of Public Records**. A copy of an official record—or a copy of a document that was recorded or filed in a public office as authorized by law—if the copy is certified as correct by:

(A) the custodian or another person authorized to make the certification; or

(B) a certificate that complies with Rule 902(1), (2), or (3), a federal statute, or a rule prescribed by the Supreme Court.

Pa.R.E. 902(4).

Further, the Commonwealth's statute governing the authentication of official records into evidence, which includes court orders, provides the following:

**§ 6103. Proof of official records.**

**(a) General rule**.--An official record kept within this Commonwealth by any court, magisterial district judge or other government unit, or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by the officer having the legal custody of the record, or by that officer's deputy, and accompanied by a certificate that the officer has the custody. The certificate may be made by any public officer having a seal of office and having official duties with respect to the government unit in which the record is kept, authenticated by the seal of that office, or if there is no such officer, by:

. . .

(2) The clerk of the court of common pleas of the judicial district embracing any county in which the government unit has jurisdiction, in the case of any government unit other than a Commonwealth agency.

42 Pa.C.S.A. § 6103(a)(2).

Although related, dependency proceedings and termination proceedings are two separate, distinct proceedings "with their own docket numbers, records, and divisions within the Court of Common Pleas." *Interest of S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021). Therefore, the orders from underlying dependency matters are not part of the termination record unless properly admitted into evidence. *See id.* (holding that the court's consideration of a report that was entered at a prior hearing in the underlying dependency case, but not admitted into evidence in the termination proceeding, constituted "consideration of evidence outside the record[.]").

Here, DHS introduced the dependency dockets into evidence, and Mother objected on the basis that they were not properly certified. *See* N.T., 5/14/25, at 14-15. The trial court overruled Mother's objection. *See id.* In

- 11 -

its Rule 1925(a) opinion, the court reasoned that it properly overruled her objection and admitted the dockets because the orders memorialized in the dockets were certified by a "notarial act" by the clerk of the court.  Trial Court Opinion, 6/30/25, at 8-9 (citing 57 Pa.C.S.A. § 302, 310) (Revised Uniform Law on Notarial Acts).  However, the court's reliance upon Title 57 is mistaken inasmuch as it pertains to the law governing notaries and not to the admission of evidence.  Moreover, even if relevant, the court's reliance upon the cited subsections is misplaced since there are no markings on the dockets demonstrating that they were notarized.  **See generally** DHS Exhibit 3.

Here, DHS did not attempt to authenticate the dockets through any of the methods identified in Rule 901(b).  DHS also did not seek to establish authenticity of the dockets pursuant to Rule 902(4) or Section 6103.  Counsel for DHS simply asked for the dockets to be admitted without laying any foundation whatsoever.  **See** N.T., 5/14/25, at 14.  Accordingly, we conclude that the Children's dockets from their underlying dependency proceedings were improperly admitted at the termination hearing.

Nevertheless, an erroneous evidentiary ruling is harmless if it "could not have had any impact upon the orphans' court's decision."  **In re A.J.R.-H**., 188 A.3d 1157, 1175 (Pa. 2018).  Upon review, there is no indication that the court relied upon the improperly admitted dockets to involuntarily terminate Mother's parental rights.  Rather, as detailed *infra*, we conclude that the court relied upon properly admitted evidence in involuntarily terminating Mother's

- 12 -

parental rights. Therefore, we conclude that the court's admission of the dockets was harmless error, and Mother is not entitled to relief on this claim. *See id.*

    b. Dr. Russell's PCE reports

In Mother's second issue, she argues that the trial court abused its discretion when it admitted into evidence Dr. Russell's PCE reports on the basis of inadmissible hearsay. *See* Mother's Brief at 16-18; *see also* DHS Exhibit 5 and 6. Mother contends that Dr. Russell's opinions were based upon inadmissible hearsay because he relied upon materials that were not in evidence. *See id.* at 17-18. Specifically, Mother asserts that Dr. Russell's reliance upon her medical records relating to her diagnoses, particularly Trisomy X Syndrome, was inadmissible hearsay. *See id.*; DHS Exhibit 6 at 10. Mother argues that Dr. Russell's reliance upon those records discredits his opinions regarding her inability to provide safety for the Children and that she is unlikely to develop a parental capacity through individual therapy. *See* Mother's Brief at 17-18; DHS Exhibit 6 at 10.

In his reports, Dr. Russell stated that Mother's medical records indicated that she was "born with Trisomy X syndrome," which he described as having "differences in brain structure, particularly in the cortical regions." DHS Exhibit 6 at 7; *see also* N.T., 5/14/25, at 24. He explained that the cortical region of the brain is responsible for "executive functions," which include her ability to process information, organizational skills, and to follow tasks through

to completion. DHS Exhibit 6 at 10; N.T., 5/14/25, at 23-24. Dr. Russell also reviewed records indicating that Mother was diagnosed with major depressive disorder with "recurrent, severe, [and] psychotic features," autism spectrum disorder, and attention deficit hyperactivity disorder. DHS Exhibit 6 at 7. Based on the totality of his evaluations, Dr. Russell opined that Mother was unable to provide a safe environment for the Children and that her impairments would not be overcome through participation in therapy. N.T., 5/14/25, at 25; DHS Exhibit 6 at 10.

We discern no abuse of discretion by the court in concluding that Dr. Russell's reports were not hearsay inasmuch as he authored them and testified with respect to them. *See* N.T., 5/14/25, at 17-31; *see also* Pa.R.E. 801(c) (defining hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

To the extent Mother has relied upon *Commonwealth v. McCloud*, 322 A.2d 653 (Pa. 1974), in support of her argument, we conclude that she misapprehends the holding of that case. *See* Mother's Brief at 17. In that second-degree murder case, the issue was the lower court's allowance for the Commonwealth to read an autopsy report into evidence without calling the medical examiner who authored it as a trial witness. *McCloud*, 322 A.2d at 654. On appeal, our Supreme Court reversed for a new trial because the defendant was denied his right to cross-examine the medical examiner

concerning the contents of the autopsy report. ***See id.*** at 656-57. However, the ***McCloud*** Court continued, "Of course, when the examiner does testify and is subject to cross-examination, his report may be used." ***Id.*** at 657. Here, the author of the reports, Dr. Russell, testified with respect to his findings and Mother cross-examined him. Therefore, Mother's reliance upon ***McCloud*** is unavailing.

Moreover, with respect to the basis for an expert's opinion, this Court has explained:

> Rule 705 of the Pennsylvania Rules of Evidence requires an expert to "state the facts or data on which the opinion is based." Pa.R.E. 705. Rule 703 provides that so long as the facts and data the expert relies upon are of a type reasonably relied upon by experts in that particular field of study, "they need not be admissible for the opinion to be admitted." Pa.R.E. 703. In interpreting these evidentiary rules, this Court has held as follows:
>
> > It is well-established that an expert may express an opinion which is based on material not in evidence, including other expert opinion, where such material is of a type customarily relied on by experts in his or her profession. Such material may be disclosed at trial even though it might otherwise be hearsay. . . . Such hearsay is admissible because the expert's reliance on the material provides its own indication of the material's trustworthiness[.] The fact that experts reasonably and regularly rely on this type of information merely to practice their profession lends strong indicia of reliability to source material, when it is presented through a qualified expert's eyes. ***In re D.Y.***, [] 34 A.3d 177, 182 (Pa. Super. 2011).

***In re Adoption of R.K.Y.***, 72 A.3d 669, 677 (Pa. Super. 2013) (some internal citations and quotation marks omitted).

Dr. Russell testified regarding his review of Mother's records, as follows:

- 15 -

Q: And what history did you review regarding [Mother]?

A: [A]ll the information I reviewed in both reports is listed on the first page. They include the basic – typical material I receive in these types of evaluations from [DHS], that is they have any psychological records, any other mental health records, social records, records of the case, the docket of the case, any dependency petitions that were generated, and any other relevant information that the referral team felt was important.

. . .

Q: Did you arrive at an opinion regarding [Mother]'s capacity to parent [the C]hildren?

A: Yes, I did.

Q: What was that opinion?

A: That she's not able to provide a safe and long-term environment for [the C]hildren.

Q: How did you arrive at that conclusion?

A: Following the procedure I [] described, in terms of a typical parenting capacity evaluation. By examining her history; viewing different materials . . . such as prior psychological records, looking at those results. There was IQ testing conducted on [Mother]. I, then, used some psychological testing, in this case the MMPI-2, to look at her functioning. . . . [T]hen, the interviews. I spent several hours over the course of two evaluations with [Mother].

N.T., 5/14/25, at 20, 23. Dr. Russell also testified that the procedure that he follows for parenting capacity evaluations are "consistent with the guidelines for forensic psychologists," and guidelines promulgated by the American Psychological Association. *Id.* at 30.

Therefore, Dr. Russell based his opinion with respect to Mother's parental incapacity upon a combination of her medical records, as well as his

- 16 -

own testing and interviews of Mother. *See id.* at 23. Dr. Russell's testimony, along with the content of the reports, satisfies the prerequisites for the proper admission of his opinions pursuant to Rules 703 and 705. We discern no issue with Dr. Russell basing his expert opinions, in part, upon "material not in evidence" as he clearly explained that the materials were "of a type customarily relied on by experts in his or her profession." *R.K.Y.* 72 A.3d 669, 677.

We conclude that the trial court did not abuse its discretion by overruling Mother's objection to the admission of Dr. Russell's PCE reports on the basis of inadmissible hearsay.

c. The *Frye* standard

In her third evidentiary issue, Mother argues that the trial court abused its discretion by sustaining DHS's objection to her counsel's question during Dr. Russell's cross-examination. *See* Mother's Brief at 6; *see also* N.T., 5/14/25, at 30. The relevant portion of Mother's cross-examination of Dr. Russell was as follows:

> Q: Is – based on your expertise, is your conclusion, based on what you've been provided with consistent with other experts in the field?
>
> A: The procedures I follow in conducting a parenting capacity evaluation are consistent with the guidelines for forensic psychologists, as well as the guidelines for psychologists fostered by the American Psychological Association.
>
> Q: Is your conclusion consistent with what other experts would conclude?

[Counsel for DHS]: Objection. That calls for speculation.

. . .

The court: That objection is sustained. It calls –

[Mother's counsel]: Well, that's the *Frye* test.

The court: The objection is sustained.

N.T., 5/14/25, at 30 (emphasis added).

Mother contends that the excluded question related to the scientific legitimacy of Dr. Russell's expert opinion regarding her inability to provide a safe environment for the Children. *See* Mother's Brief at 18. Mother argues that because the court did not allow her question, Dr. Russell's expert opinion did not meet the standard established in *Frye v. United States*, 293 F. 1013, 1014 (1923) and was consequently "questionable[.]" *Id.* at 19. We disagree.

With respect to expert testimony, *Frye* stated:

> [W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye*, 293 F. at 1014. This standard was first recognized in Pennsylvania in *Commonwealth v. Topa*, 369 A.2d 1277, 1280-82 (Pa. 1977), which relied upon the *Frye* standard when reversing a murder conviction based upon voiceprint analysis from a phone call confession, when experts in the field questioned its credibility.

Here, we conclude that Dr. Russell's response to Mother's first question satisfied the *Frye* standard. Dr. Russell unequivocally stated that his procedure was consistent with several guidelines in psychology, which sufficiently establishes its general acceptance in the field. *See* N.T., 5/14/25, at 30; *Frye*, 293 F. at 1014. Furthermore, we emphasize that Mother stipulated to Dr. Russell's expertise in parenting capacity. *See* N.T., 5/14/25, at 15. Therefore, Mother's third issue merits no relief.

<u>Involuntary Termination of Parental Rights</u>

Mother's final six issues claim that the record evidence was insufficient to support the trial court's decision to involuntarily terminate her parental rights to the Children pursuant to Section 2511(a)(1), (2), (5), (8), and (b). Our standard of review in this context is well settled:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the trial court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See M.E.*, 283 A.3d at 830 (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Our analysis in this case will focus upon 23 Pa.C.S.A. § 2511(a)(2) and (b),[11] which provide, as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy Section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal;

---

[11] Given our disposition with respect to Section 2511(a)(2), we need not review Mother's fourth, sixth, seventh, and ninth issues. *See B.L.W.*, 843 A.2d at 384; *see also In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*) (observing this Court may proceed to a review of one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

(2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)). Overall, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443.

Further, it is well-settled that Section 2511(a)(2) provides the statutory basis for "terminating involuntarily the rights of a parent with a physical or mental impairment." *In re Adoption of J.J.,* 515 A.2d 883, 893 (Pa. 1986). Our Supreme Court emphasized, "the focus in such cases is the effect which an impairment has on the person's ability to provide parental care, not the mere fact of impairment. . . ." *Id*. As such, the Court stated, "The fact that a parent suffers from a physical or mental disability is not, and never was, the only relevant factor in determining whether his or her parental rights should be terminated, or whether there should be a different legal standard applied." *Id*.

With respect to this subsection, Mother reiterates her assertion that Dr. Russell's expert opinion regarding her inability to parent the Children was

- 22 -

inadmissible, and therefore the court erred in crediting his testimony. *See* Mother's Brief at 24. Mother argues that Dr. Russell's personal interviews with Mother revealed no discernable issues with her parenting capacity. *See id.* at 24-25. Mother further claims that she successfully completed most of her permanency objectives. *See id.* at 25.

The trial court found that Mother's impaired cognitive abilities constituted a repeated and continued incapacity that caused the Children to be without proper parental and control. *See* Trial Court Opinion, 6/30/25, at 6-7. In addition, the court reasoned that Mother cannot or will not remedy her incapacity. *See id.*

The court's findings are supported by the certified record. We have established that Dr. Russell's expert opinions were indeed admissible in our above discussion of Mother's failed evidentiary issues. We further note that the court was undoubtedly within its discretion to determine that Dr. Russell's expert testimony was credible. *See In re R.A.M.N.*, 230 A.3d 423, 427 (Pa. Super. 2020) (the trial court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations[.]") (citation omitted).

It is undisputed that Mother has never provided the Children with proper parental care and control, as they were all removed from her care shortly after their respective births. Dr. Russell testified that, in his expert opinion, Mother could not provide a safe environment or appropriate supervision for the

Children. *See* N.T., 5/14/25, at 25. He explained that this opinion was, in part, based upon Mother's cognitive impairments. *See id.* at 24. Dr. Russell stated that the psychological testing that he conducted with Mother and her "presentation" at the interviews were "consistent with an extremely low IQ score." *Id.* at 24. For example, as mentioned above, Mother relocated to New York in March of 2024, for the purpose of marrying a man. *See* DHS Exhibit 6 at 6. Dr. Russell reported that, upon inquiring about the name of her husband, she provided the wrong first name and was unable to remember his surname. *See id.* Dr. Russell further testified that Mother has impaired intellectual functioning, which he described as difficulties with "executive functions," as described above. *Id.* at 23-24. Dr. Russell also reported that Mother's Trisomy X syndrome could contribute to her decreased cognitive functioning. *See* N.T., 5/14/25, at 24.

The record is devoid of any evidence that Mother successfully completed the court-ordered mental health evaluation or any recommended treatment. Notwithstanding, Ms. McCray testified that Mother had not participated in mental health treatment in two years, last attending sometime in 2023. *See id.* at 42-44. Even if she had engaged with treatment, Dr. Russell concluded that therapy would not provide Mother "any tangible benefit" due to the extent of her cognitive impairments. DHS Exhibit 6 at 10.

Further, while Mother was temporarily granted unsupervised visits with I.C., there is no record evidence that she participated in those visits, and the

court ultimately revoked them. *See* DHS Exhibit 3 (I.C.) at 81-82, 87. Mother had regressed back to only supervised visits with I.C. for the seven months preceding the subject hearing. *See id.* at 87-89. Mother never progressed past supervised visits with the triplets and only attended three visits with them in eighteen months. *See generally* DHS Exhibit 3 (I.H.C.); *see also* N.T., 5/14/25, at 40, 49. Ms. Richardson, who supervised the visits, stated that Mother was unable to manage the Children without assistance. *See* N.T., 5/14/25, at 50. She explained that Mother would bring relatives to assist her during visits or request help from the supervision staff. *See id.* at 49-50. Mother testified that she had not taken a parenting class since 2021, well before the birth of the triplets. *See id.* at 55-56; Mother's Exhibit 1 at 1.

In addition, the triplets participated in services for undescribed special needs, such as physical and occupational therapy. *See* N.T., 5/14/25, at 45. Ms. McCray testified that M.A.H.C. and I.H.C. were "recently discharged," although the record does not describe from which services. *Id.* Mother testified that she was unaware of any special services that any of the Children received. *See id.* at 56.

The foregoing record evidence demonstrates that Mother's repeated and continued incapacity due to her cognitive impairments has caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. The record undoubtedly supports that her incapacity cannot or will not be remedied inasmuch as Dr. Russell concluded

she would not benefit from therapy, and she had not remedied her incapacity in four years with DHS services. Therefore, we discern no abuse of discretion in the trial court's determination that termination of Mother's parental rights was warranted pursuant to Section 2511(a)(2).

If the trial court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court must then turn to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267. Our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child. *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). The "severance of a necessary and beneficial relationship [is] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-10. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

The *K.T.* Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional

needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." ***K.T.***, 296 A.3d at 1109. Further, trial courts "must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***Id.*** at 1106.

It is within the province of the trial court to "consider the totality of the circumstances when performing a needs and welfare analysis." ***M.E.***, 283 A.3d at 839. We will not disturb such an assessment if the court's factual findings are supported by the record. ***See id.***

Regarding Section 2511(b), Mother concedes that the Children are "thriving" in their respective foster placements. Mother's Brief at 26. Mother's only argument is that, assuming DHS failed to satisfy its evidentiary burden under Section 2511(a), then the court abused its discretion by considering Section 2511(b). ***See id.*** at 26-27; ***see also T.S.M.***, 71 A.3d at 267 (reiterating that only if the trial court determines that termination is warranted under Section 2511(a) does it then consider Section 2511(b)). Mother does not argue that she has any bond with the Children. Mother's argument fails because we have already concluded that the involuntary termination of Mother's parental rights pursuant to Section 2511(a)(2) was warranted.

In any event, the certified record supports the trial court's conclusion that DHS met its evidentiary burden pursuant to Section 2511(b). When asked if the Children shared a parental bond with Mother, Ms. Richardson replied, "Not at all. No." N.T., 5/14/25, at 50. Ms. McCray testified that

Mother had only seen the triplets "maybe twice" prior to her last visit with them on May 1, 2025. *Id.* at 40. Further, Ms. Richardson explained that I.C. would take about an hour to "acclimate" to Mother in visits. *Id.* at 50. She continued that I.C. "wasn't interested at all" in interacting with Mother. *Id.* Ms. McCray testified that the Children share parental bonds with their respective pre-adoptive caregivers. *See id.* at 33-36.

Therefore, the record evidence establishes that the Children do not share any relationship with Mother, let alone a necessary and beneficial one. *See K.T.*, 296 A.3d at 1109. Based upon the undisputed testimonial evidence set forth above, we discern no error or abuse of discretion in the trial court's conclusion that the termination of Mother's parental rights will serve the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

Thus, we affirm the decrees involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decrees affirmed.

Judge Nichols joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>1/16/2026</u>